FILED

2020 Dec-31 PM 02:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF ALABAMA**
**NORTHERN DISTRICT**

| | |
|---|---|
| Karen Carter, individually, and on behalf of all similarly situated persons,<br><br>        Plaintiff,<br><br>vs.<br><br>Bankhead 2192 AL LLC and Millennia Housing Management, LTD. and Fictitious Defendants "A", "B", and "C", whether singular or plural, those other persons, corporations, firms or other entities whose wrongful conduct caused or contributed to caused damages to the Plaintiff, all of whose true and correct names are unknown to Plaintiff at this time, but will be added by amendment when ascertained,<br><br>        Defendants. | CIVIL ACTION NO. 2:20-CV-01700-SGC<br><br>**(JURY TRIAL DEMANDED)** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, Karen Carter, individually, and on behalf of the class described below, brings this class action suit against Defendants, Bankhead 2192 AL LLC, and Millennia Housing Management LTD (hereinafter "Defendants"), and respectfully shows unto the Court the following:

### PARTIES

1.    Plaintiff is a citizen of the State of Alabama, and resides in Jefferson County, Alabama, which is within the Northern District of the Alabama.

2.    Defendant Bankhead 2192 AL, LLC is a domestic limited liability company with its primary place of business in Cleveland, OH but doing business in the State of Alabama,

Jefferson County at all times material to the issues. Frank T. Sinito is the managing member of this LLC, having citizenship in Valley View, OH at all times material to the issues. Other members are Malisse Sinto, Angelica Sinto and MJB&Z, Inc all having citizenship in Ohio at all times pertinent to the issues.

3.      Defendant Millennia Housing Management, LTD is a foreign corporation doing business in Birmingham, Jefferson County, Alabama at all times material to the issues. Frank T. Sinito is the managing member of this LLC, having citizenship in Valley View, OH at all times material to the issues. Other members are Malisse Sinto and Angelica Sinto, both having citizenship in Ohio at all times pertinent to the issues.

## JURISDICTION AND VENUE

4.      The Court has original jurisdiction of this matter, *inter alia*¸ under the Class Action Fairness Act (CAFA), 29 U.S.C. § 1332(d)(2).  Plaintiff and Defendant are citizens of different states; the amount in controversy in this action exceeds $5,000,000.00. There are more than one hundred (100) members of the putative class and all class members are citizens of the State of Alabama.

5.      The Court has general and specific personal jurisdiction over the Defendant Bankhead 2192 AL, LLC due to their sufficient contacts within the State of Alabama and because the material acts upon which Plaintiffs' claims are based occurred within the State of Alabama.

6.      The Court has general and specific personal jurisdiction over the Defendant Millennia Housing Management due to their sufficient minimum contacts within the State of Alabama and that all members of the Limited Liability Company Millennia Housing

Management were/are citizens of Ohio at all times material to the issues and because all material acts upon which Plaintiffs' claims are based occurred within the State of Alabama.

7.     Venue is proper in the United States District Court for the Northern District of Alabama pursuant to 28 U.S.C. § 1391(c)(2) as a substantial part of the events giving rise to the claims occurred within the State of Alabama.

## NATURE OF SUIT

8.     Plaintiff brings this state-wide class action lawsuit against Bankhead 2192 AL LLC, and Millennia Housing Management LTD pursuant to Federal Rule of Civil Procedure 23(b)(3) for willful and wanton violations of federal health and safety regulations, statutory deceptive acts and practices, unjust enrichment, breach of the warranty of habitability, breach of contract, and premises liability claims. Specifically, Plaintiff alleges the Defendants have failed to maintain and refuse to correct a pervasive pest problem which has resulted in an uninhabitable living situation at the Bankhead Towers Apartments. Despite their failures, the Defendants continue to profit from the leasing of pest-ridden apartments to Plaintiffs.

9.     Plaintiff is seeking injunctive and compensatory relief from Defendants for willful and wanton conduct in violation of federal health and safety regulations established by the U.S. Department of Housing and Urban Development (HUD).

## STATEMENT OF FACTS

1.     Bankhead 2192 ("Bankhead Towers") is a multifamily apartment building located in Birmingham, Alabama, at 2300 5th Avenue North, Birmingham, Alabama 35203.

2.     Bankhead 2192, LLC participate in the HUD Section 8 program and are owned and/or managed by Defendants, providing residences for low-income and/or vulnerable members of the community.

3.      The Residents of Bankhead Towers include members of the community over the age of sixty-two (62) years-of-age and/or those with physical, mental, or other disabilities.

4.      Millennia Housing Management LTD is and/or was, at all times relevant to this matter, responsible for the management, maintenance, and general supervision of the accommodations occupied by Plaintiffs within the Bankhead Towers Apartments.

5.      Karen Carter is a resident of the Bankhead Towers Apartments, having resided there at all times from March 2020.

6.      At all times complained of herein, the Department of Housing and Urban Development's ("HUD") health and safety regulations mandates all premises receiving funding through Section 8 of the Housing Act of 1937, 42 U.S.C. § 1437f, ("Section 8") be decent, safe, sanitary and in good repair; that all areas and components of the premises be free of vermin; that there be no evidence of infestation by vermin; and that the premises comply with local building and maintenance codes.

7.      Upon information and belief, Bankhead 2192 and Millennia Housing Management are major recipients of Section 8 funding, by and through which the majority of periodic rents are satisfied for the accommodations occupied by the Plaintiffs.

8.      Upon information and belief, without such funding, the Bankhead Towers would cease to be economically viable to operate in the current form.

9.      From February 2010 and continuing to date, departments and agencies of the United States government- HUD, the U.S. Environmental Protection Agency ("EPA"), and the Centers for Disease Control and Prevention ("CDC")- have issued a series of notices and reports concerning the resurgence of bed bugs.

10.     These agencies have declared, through notices and reports, this resurgence is a national health concern and have worked to promulgate the best practices and most effective methods to eradicate bed bug infestations in multifamily structures, including those which provide federally subsidized housing.

11.     These notices and reports were distributed and/or made available to governmental bodies, including those tasked with the local management and regulation of federally subsidized housing.

12.     Upon information and belief, the aforementioned notices and reports were distributed and/or made available to the Jefferson County Housing Authority.

13.     The information and guidance contained in the aforementioned notices and reports, of which Defendants were aware or should have been aware, included, but were not limited to, the following:

1.   The last several decades have seen a nationwide resurgence of bed bugs, which are now officially recognized as a significant risk to public health, safety and welfare.

2.   Bed bugs feed almost exclusively on human blood, preying upon people while they are asleep and injecting them with both an anticoagulant and an anesthetic to increase the speed at which the bed bugs can gorge on blood, while preventing the victims from feeling the bites or being aware of the feeding process.

3.   Because of their small flat bodies, bed bugs can fit into extremely small spaces and are adept at hiding in areas such as mattresses, box springs, other bedding, bed frames, headboards, dressers and other furniture,

household objects and clutter, electrical fixtures and outlets, baseboards, molding, window and door frames, picture frames, utility ducts and conduits, carpeting and rugs, wall cracks and crevices, and even behind wallpaper.

4. Bed bugs are able to travel over 100 feet in one night and can readily spread throughout a building, moving through cracks or apertures in walls and floors, migrating through common utility ducts and conduits, and also by human dispersal as items of infested personal property are moved through hallways and common areas, leaving a trial of bed bug eggs, larvae, or mature insects that were "hitching a ride".

5. Research continues as to whether bed bugs can directly transmit diseases or viruses, but their bites are known to produce severely itching, highly visible red marks or streaks (with occasional scarring) on the face, neck, arms, legs, and other parts of the body; mild to severe allergic reactions; secondary skin infections; insomnia; anxiety; fear; shame; humiliation; and other mental and emotional distress.

6. There is no chemical silver bullet for bed bug eradication nor is there one in the pesticide development pipeline, due, *inter alia*, to the speed at which bed bugs develop resistance to pesticides, the impossibility of systemic treatment because of the bed bug's virtually exclusive diet of human blood; and the problem that pesticides can do more to disperse bed bugs than to eradicate them.

7. Eradication of bed bugs becomes even more challenging in large multifamily buildings, especially when these buildings are occupied by

residents with infirmities such as physical or mental disabilities and/or poverty.

8. When bed bugs have infested such a building, the best practice and most effective method to eradicate them, other than building-wide evacuation and fumigation, is an Integrated Pest Management Plan ("IPM"), a multifaceted approach focused not primarily on pesticides but rather on the education and motivation of the building's residents to work as members of a team, with the building's management and a professional pest management service ("PPM"), to implement a comprehensive set of proactive, nonchemical treatments, which are designed to isolate bed bugs and prevent them from feeding.

9. An IPM must begin with the building's management using resident meetings, question and answer sessions, written materials, audio-visual presentations, one-on-one counseling (when necessary) and similar forms of communication and outreach to make residents fully aware of the bed bug infestation, train them to observe signs of bed bug activity, urge them to immediately report all such activity by removing any stigma associated with having bed bugs invade one's apartment, and clearly explain the nature of the IPM approach and what residents are expected to do to assist in the plan's implementation.

10. IPM implementation then requires the building's management, working with residents and the PPM, to undertake a series of proactive, nonchemical treatments such as sealing all cracks, crevices, wall voids, baseboards, and other potential avenues of bed bug migration; encasing mattresses and box springs throughout the building in puncture-proof plastic covers; having

infested areas (and nearby areas above, below, and to the sides) vacuumed with pest control vacuums that have crevice tools and other special attachments for small spaces; employing efficacious temperature treatments such as steaming, flash freezing, and ambient heat; furnishing residents with onsite washers and dryers dedicated solely to bed bug control, while instructing residents about the times for washing and drying and the heat settings necessary to kill bed bugs; furnishing residents with disposable and dissolvable plastic bags for the transportation of laundry, while instructing residents to segregate and seal all properly laundered items; and encouraging and/or assisting residents to move their beds into island positions and use petroleum jelly to coat the bottoms of the legs.

11. IPM implementation in a multifamily building additionally requires management to create and enforce rules and policies designed to prevent infested property from entering the building, being moved around inside the building, or being recycled through the building by residents, for example, retrieving infested property that other residents have put into the trash disposal area; while management also imposes an appropriate bed bug monitoring and inspection period before any vacant apartment is reoccupied.

12. In conjunction with this teamwork approach, management may consider supplementing an IPM with the judicious use of safe and approved pesticides to be applied by a PPM, ensuring that residents are informed about the pesticides and where they have been applied, and providing

medical contact information should there be side effects or adverse events caused by the chemicals.

13. Throughout all phases of an IPM in a multifamily public housing building, management should offer assistance, through staff or social service agencies, to elderly or disabled residents who might encounter difficulty in preparing for implementation procedures or performing other responsibilities required of them; while management maintains complete and accurate records of all information and communications pertaining to the IPM and the infestation, making necessary and appropriate reports to governmental agencies, such as HUD, which monitor bed bug issues.

14. Karen Carter has persistently advised the management and maintenance staff that there is a bedbug infestation throughout the building. During this time, the Residents, including Karen Carter, repeatedly suffered the indignity of being bitten by these vermin.

15. Management and maintenance persistently failed to correct this vermin infestation, which remains present today. Defendants, as a matter of policy express or implied, attempted to conceal the vermin infestation from Residents, including those renewing leases or moving into the building, by omitting mention of bed bugs in Resident meetings, notices, or other communications and by ignoring notices that infestation was occurring. All of these actions foreclosed any possibility of forming an IPM team with Residents to respond to the Bankhead Towers infestation.

16. During this time, Bankhead Towers Residents were abandoned by management and forced to discover, independently and without any assistance, the building was suffering from a growing vermin infestation, which was spreading throughout the building.

17.     During this time, Residents began sharing their concerns about the growing vermin infestation crisis with fellow Residents, lamenting the total lack of response on the part of management.

18.     Due to the inaction of management, Residents feared falling asleep, afraid of the vermin gorging upon their blood, afraid dawn would find them itchy, inflamed, and speckled with red bite marks and/or streaks throughout their bodies.

19.     Due to the inaction of management, Residents grew increasingly apprehensive about the real risk of infections, allergic reactions, and/or scarring resulting from this vermin infestation.

20.     Due to the inaction of management; Residents grew to feel shame and humiliation for the pervasive presence of vermin in their leased unit and/or wider apartment building;

21.     Due to the inaction of management, Residents suffered from constant fear and anxiety the vermin would invade their rented unit and/or remain in the same.

22.     Due to this unrelenting fear of vermin, Residents periodically had to flee their homes and seek refuge elsewhere, when the toll of cohabitating with vermin or the ever-present threat of invasions of vermin became unbearable.

23.     Due to this vermin infestation, Residents became personal carriers of vermin, in their hair and/or clothing;

24.     Due to this vermin infestation, Residents  often discovered vermin, vermin exoskeletons (shed skins), or vermin fecal remains of human blood upon bedding, furniture, clothes, and/or other items of personal property; which often predicated the immediate, necessary disposal of those soiled property items, causing economic hardship to Residents..

25.     Due to this vermin infestation, Residents feared introducing visitors to their rented unit and/or apartment, including family and friends, to the aforementioned risks, impacts, and other issues relating to the vermin infestation.

26.     Due to this vermin infestation, Residents feared exporting this vermin infestation to other premises, including the premises of family and friends, by even the Residents mere presence therein; as a consequence, Residents may have limited interaction with family and friends.

27.     At the time of this filing, the Defendants have failed to address the ongoing, rampant vermin infestation. Upon information and belief, Bankhead Towers remains infested with bedbugs and current Residents continue to be endangered and damaged as set forth above.

## CLASS ALLEGATIONS

28.     Plaintiff hereby repleads and incorporates by reference each and every allegation set forth above, and further states as follows:

29.     Plaintiff brings this statewide class action, pursuant to Rule 23 of the *Federal Rules of Civil Procedure*, individually and on behalf of all members of the following Class. The Class consists of:

> All natural persons located and living in Bankhead Towers Apartments from within the longest period of time allowed by statute before the filing of this suit up through and including the date of the judgment in this case;
>
> Excluded from the Class are the following individuals and/or entities:
>
> a. Any and all federal, state or local governments, including but not limited to their department, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions;

b. Individuals, if any, who timely opt out of this proceeding using the correct protocol for opting out;

c. Current or former employees of Bankhead 2192 and/or Millennia Housing Development.

d. Individuals, if any, who have previously settled or compromised claims(s) as identified herein for the class; and

e. Any current sitting federal judge and/or person within the third degree of consanguinity to any federal judge.

## NUMEROSITY

30. The Class is so numerous that joinder of all members is impractical.

31. The number of separate individuals who lives and/or resides at the Bankhead Towers exceeds 100 persons.

32. Upon information and belief, the number of residents of Bankhead Towers is at least two-hundred and fifty one (251) persons, as Bankhead Towers consists of two-hundred and fifty one (251) apartment units.

## COMMONALITY

33. There are questions of law or fact common to the Class. These questions include, but are not limited to, the following:

1. Whether Bankhead Towers became infested with bed bugs and, if so, when Defendants became aware of it;

2. Whether Residents were endangered and/or damaged by this infestation;

3. Whether the conditions at Bankhead Towers were rendered less than habitable due to the infestation of bed bugs;

4.  What, if anything, Defendants told Residents about this infestation;

5.  Whether Residents renewed leases or signed new leases without being informed of this infestation;

6.  Whether Bankhead Towers charged proposed class members excessive rent in light of the bed bug infestation so as to constitute unjust enrichment;

7.  Whether Bankhead Towers unlawfully allowed a dangerous or unsafe condition to exist that unreasonably subjected proposed class members to bed bug bites;

8.  What Defendants knew or should have known about the best practices and most effective methods of bed bug eradication in multifamily buildings;

9.  Whether Defendants followed those best practices and most effective methods'

10.  If not, whether this failure by Defendants allowed the bed bug infestation to spread;

11.  Whether Defendants maintained Bankhead Towers in compliance with HUD health and safety regulations;

12.  If not, whether their failure to do so, while at the same time concealing the bed bug infestation from Residents, was willful and wanton;

13.  Whether the conduct by Defendants constitute deceptive acts or practices under Federal law;

14.  Whether the conduct by Defendants constitute deceptive acts or practices under Alabama law;

15. Whether Residents received rental assistance through the HUD Section 8 program and whether Defendants were paid excessive rent for substandard housing;

16. Whether Residents are entitled to restitution of these excessive payments and to other monetary compensation for the endangerment and damages they suffered; and

17. Whether buildingwide injunctive relief is necessary and appropriate to eradicate this bed bug infestation; all of which common questions of law and fact together meet the requirements of Rule 23 (b)(3).

## TYPICALITY

34.     Plaintiff's claims are typical of the claims of the Class in that Plaintiff and the Class all lived/resided at Bankhead Towers during the allowed vermin infestation. Neither Plaintiff nor the Class consented to living in this uninhabitable condition made the basis of this suit, Plaintiff and the Class members are entitled to declaratory relief, statutory damages, and injunctive relief due to Defendant's conduct.

## ADEQUACY OF REPRESENTATION

35.     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests do not conflict with the interest of the Class members. Furthermore, Plaintiff has retained competent counsel experienced in class action litigation. Plaintiff's counsel will fairly and adequately protect and represent the interests of the Class.

36.     Plaintiff asserts that pursuant to Fed. R. Civ. P. 23(b)(3), questions of law or fact common to the Class Members predominate over any questions affecting only individual

members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## COUNT 1: WILLFUL AND WANTON VIOLATIONS OF FEDERAL HEALTH AND SAFETY REGULATIONS

37.     Plaintiff hereby repleads and incorporates by reference, each and every allegation set forth above, and further states as follows:

38.     The aforesaid conduct by Defendants of failing to disclose to Residents the fact of and/or severity of the bed bug infestation of Bankhead Towers; to fail to form with Residents and PPM an IPM implementation team and to fail to use best practices and most effective methods of bed bug eradication in multifamily buildings, of which Defendants were aware of should have been aware, through which failures allowed the infestation to spread among the building and to endanger the entire building, constitutes recklessness and willful and wanton conduct in violation of HUD health and safety regulations.

Wherefore, Plaintiffs individually and on behalf of Residents, respectfully pray for redress from Defendants as set forth in the Relief and Damages section of this Complaint.

## COUNT 2: STATUTORY DECEPTIVE ACTS AND PRACTICES

39.     Plaintiff hereby repleads and incorporates by reference, each and every allegation set forth above, and further states as follows:

40.     Defendants failure to inform Residents of the material fact of the severe bed bug infestation of Bankhead Towers with the intent that Residents remain in the building, renew their leases or move into the building in reliance upon this concealment and misrepresentations, constitutes deceptive acts or practices.

Wherefore, Plaintiffs individually and on behalf of Residents, respectfully pray for redress from Defendants as set forth in the Relief and Damages section of this Complaint.

## COUNT 3: UNJUST ENRICHMENT

41.    Plaintiff hereby repleads and incorporates by reference, each and every allegation set forth above, and further states as follows:

42.    Defendants' failure to maintain Bankhead Towers in a habitable condition by failing to eradicate the rampant bed bug infestation, while continuing to collect periodic rental payments, in full, from Residents, constitutes unjust enrichment under Alabama law.

Wherefore, Plaintiffs individually and on behalf of Residents, respectfully pray for redress from Defendants as set forth in the Relief and Damages section of this Complaint.

## COUNT 4: BREACH OF WARRANTY OF HABITABILITY

43.    Plaintiff hereby repleads and incorporates by reference, each and every allegation set forth above, and further states as follows:

44.    Defendants' failure to maintain Bankhead Towers in a habitable condition by failing to eradicate a severe bed bug infestation, with said infestation having spread to many apartment units, endangering the entire building, constitutes the breach of an implied warranty of habitability provided to Residents under Federal and Alabama law.

Wherefore, Plaintiffs individually and on behalf of Residents, respectfully pray for redress from Defendants as set forth in the Relief and Damages section of this Complaint.

## COUNT 5: BREACH OF CONTRACT

45.    Plaintiff hereby repleads and incorporates by reference, each and every allegation set forth above, and further states as follows:

46.     Defendants' lease form for Bankhead Towers provides that management's obligations, inter alia, are to "regularly clean all common areas; maintain the common areas and facilities in a safe condition; arrange for collection and removal of trash and garbage; make necessary repairs with reasonable promptness; provide extermination services, as necessary."

47.     Defendants' failure to maintain Bankhead Towers in a decent, safe, and sanitary condition, as mandated by relevant HUD regulations and local building codes, constitutes a breach of contract under Alabama law.

Wherefore, Plaintiffs individually and on behalf of Residents, respectfully pray for redress from Defendants as set forth in the Relief and Damages section of this Complaint.

## COUNT 6: PREMISES LIABILITY

48.     Plaintiff hereby repleads and incorporates by reference, each and every allegation set forth above, and further states as follows:

49.     Defendants', as owners and/or managers of the Bankhead Towers, have, at all times complained of herein, had the duty to exercise reasonable care in the maintenance of their premises for the protection of Residents as well as visistors.

50.     Defendants had knowledge of the existence of a bed bug infestation in their building on at least March 2020, at which time foresaw or should have foreseen the likelihood harm would result to Residents and visitors.

51.     The purpose for which the Plaintiff and Residents entered the premises of Bankhead Towers was to occupy both their individual living units and the common areas, as contemplated in their written and/or verbal lease agreements.

52.     Plaintiffs entered, occupied and made use of the premises of Bankhead Towers in the time, manner and circumstances contemplated under these lease agreements.

53.     The use to which the premises were put or were expected to be put was residential.

54.     Defendants acted unreasonably with respect to inspection, maintenance, repair, or making warnings to Residents or visitors about the bed bug infestation.

55.     Defendants had the opportunity and ability to repair and maintain the premises by controlling and eradicating the infestation, as well as the opportunity and ability to give adequate warning about it.

56.     The burden on Defendants in terms of inconvenience or cost in providing this protection and/or notice to Residents and visitors was outweighed by the associated harm of not doing so.

57.     Defendants, in failing to exercise reasonable care in the maintenance of the Premises for the protection of Plaintiffs and Residents, proximately caused harm and damages to Plaintiffs and Residents as aforesaid.

Wherefore, Plaintiffs individually and on behalf of Residents, respectfully pray for redress from Defendants as set forth in the Relief and Damages section of this Complaint.

## **COUNT 7: FICTITIOUS PARTIES**

58.     Plaintiff re-alleges, adopts, incorporates herein by reference as a part of this Count all of the averment paragraphs 1 through 57 hereinabove and all of the factual averments of the previous Counts as fully and completely as if the same were set forth verbatim herein.

59.     Fictitious Defendants "A", "B", and "C", whether singular or plural, are those other persons, firms, corporations, or other entities whose negligent, wanton, reckless and wrongful conduct contributed to cause serious injuries to the Plaintiff, all of whose true and

correct names are unknown to Plaintiff at this time, but will be substituted by amendment when ascertained.

Wherefore, Plaintiff demands judgment against Fictitious Parties "A", "B", and "C", both jointly and severally, for all compensatory damages, court costs and attorney's fees to which Plaintiff is entitled. Furthermore, Plaintiff demands punitive damages in such an amount as this Court may determine.

## RESERVATION OF RIGHTS

Pursuant to the Rules of Pleadings and Practice, Plaintff and Residents reserve the right to asswer additional violations of federal and state law, to add additional parties to this cause, to create subclasses should the Court require, and to seek additional relief.

## JURY DEMANDED

Pursuant to the Seventh Amendment to the U.S. Constitution and Federal Rule of Civil Procedure 38 Plaintiff demands a jury on any issue triable of right by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all Class members, request judgment be entered against Defendants and that the Court grant the following:

1. An order certifying the Class and appointing Plaintiff and her counsel to represent the Class;

2. Judgment against the Defendants for Plaintiff's and the Class Members' asserted cause of action;

3. Appropriate declaratory relief against the Defendants;

4. Preliminary Emergency and permanent injunctive relief against the Defendants;

5.  An award of statutory damages to the Plaintiff and the Class, for each count, recovery for Residents mental and emotional distress, pain and suffering, loss of property, deprivation of quiet enjoyment of their homes; excessive rental payments, and other losses and damages caused them by Defendants' failure as afore-described;

6.  Punitive damages;

7.  An award of reasonable attorney's fees and other litigation costs reasonably incurred; and

8.  Any and all other relief to which the Plaintiff and the Class may be entitled.

This December 31, 2020.

Respectfully submitted,

/s/Constantin Post
CONSTANTIN POST
ATTORNEY FOR THE PLAINTIFFS

**OF COUNSEL:**
**SLOCUMB LAW FIRM, LLC**
2 20th Street North, Suite 1320
Birmingham, AL 35203
Tel. No. (205) 951-9750
Fax No.  (888)-853-2247

/s/ Rachael Schexnailder
RACHAEL SCHEXNAILDER
ATTORNEY FOR THE PLAINTIFFS

**OF COUNSEL:**
**SLOCUMB LAW FIRM, LLC**
2 20th Street North, Suite 1320
Birmingham, AL 35203
Tel. No. (205) 951-9750
Fax No.  (888)-853-2247

## <u>CERTIFICATE OF SERVICE</u>

The Plaintiff hereby certifies that the above was served on all counsel of record in this case on December 31, 2020 in accordance with the Federal Rules of Civil Procedure by CM-ECF electronic filing:

**PETER BOLVIG**
**MUDD, BOLVIG, LUKE & WELLS, LLC**
**2011 4TH AVE. NORTH**
**BIRMINGHAM, AL 35203**
**PBOLVIG@WMSLAWFIRM.COM**

*/s/ Constantin Post*
CONSTANTIN POST
OF COUNSEL